CARLSMITH, CARLSMITH, WICHMAN AND CASE, a registered Hawaii partnership, Plaintiff-Appellant, *v.* CPB PROPERTIES, INC., and CENTRAL PACIFIC BANK, Hawaii corporations, Defendants-Appellees

NO. 8163

CIVIL NO. 56390

MAY 26, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR
ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY MENOR, J.

This appeal is taken from the circuit court's denial of the appellant's motion for partial summary judgment and the granting of the

appellee's cross-motion for summary judgment. The appellant Carlsmith, Carlsmith, Wichman, and Case ("CCWC" or "appellant" hereinafter), a registered Hawaii partnership, had brought this action to enjoin the appellee CPB Properties, Inc. and Central Pacific Bank ("CPB" or "appellee" hereinafter), Hawaii corporations, from constructing a building within the Hawaii Capital District ("HCD" hereinafter) that would reach a height of approximately 264 feet. The appellant asserts that the ordinance under which the proposed construction was permitted was invalidly enacted by the City Council. The enactment challenged is Ordinance 77-60 which became effective on June 17, 1977.

The concept of a planned district surrounding and complementing the Hawaii State Capitol area was first endorsed by the City Planning Department as early as 1969. Subsequent studies and discussions regarding the matter resulted in the enactment on May 13, 1972, of Ordinance 3947, which became known as the Hawaii Capital District Ordinance. The stated purpose of the ordinance was "to establish the Honolulu Civic Center as a historic, cultural, and scenic district to be called the 'Hawaii Capital District' and to provide for its protection, preservation, enhancement, orderly development and growth."

The Hawaii Capital District is generally located between Honolulu Harbor and Punchbowl, and is situated immediately east of the Central Business District of Honolulu. It contains many of Hawaii's most historic buildings and is the center of Federal, State and City governmental activities. The business district, on the other hand, is the location for some of the city's tallest buildings. Under the existing HCD Ordinance, the building height limit for property located on the Diamond Head side of Alakea Street, including CPB's project site, was limited to 150 feet. While this restriction was in effect, CCWC, in April, 1973, entered into a long-term lease agreement for office space on the 20th and 21st floors of the Pacific Trade Center building which stands directly across Alakea Street from the CPB property. According to CCWC, it spent considerable sums in preparing the leased premises for its occupancy. Undoubtedly, the construction of the CPB building to a height within the limits allowed by the challenged ordinance would clearly inhibit CCWC's panoramic view of the city on the Diamond Head side.

In July, 1975, the City Council's Committee on Planning and Zoning advised the council that because the HCD Ordinance did not provide for the "design control system" called for by Article 12 of the Comprehensive Zoning Code ("CZC" hereinafter), as amended in 1974, it would be both necessary and desirable for the City to initiate an update of the ordinance to meet this requirement, as well as to possibly accommodate suggestions and recommendations bearing upon the scope and operation of the Ordinance. The committee accordingly recommended that the City Director of Land Utilization be requested to prepare an updated version of the HCD Ordinance. The director, however, responded by pointing out that the necessary studies and preparation of documents would be a time consuming and lengthy process which his department was not prepared to undertake at that time and recommended instead the employment of a design consultant. As a consequence, Group Architects Collaborative, Inc. ("GAC" hereinafter) was retained to prepare the update of the ordinance. To complement the work of the consultant, the City Council also formed a Capital District Advisory Committee consisting of county and state officials, representatives of entities primarily engaged in conservation and preservation activities, and various persons and entities responsible for and involved with private development on Oahu.

By February 23, 1976, GAC had prepared and submitted a two-volume report entitled, "Hawaii Capital District Ordinance Update." The report included an appendix entitled, "Ewa Boundary Study." In its introductory remarks to this study, the GAC advised:

> During the planning and study of this program, it became apparent that diverse uses and urban activities are in competition for the land areas in the District, particularly at the Ewa, or Central Business District edge. It is the purpose of this study to consider the visual implications of these pressures, and to recommend an Ewa boundary for the Historic Precinct of the Capital District.

The GAC further pointed out that the Ewa boundary of the HCD should become a transition zone between it and the Central Business District, and among its recommendations in this regard was to relate height limits along the boundary to sight lines from the center axis of the State Capitol Building to the Hawaiian Telephone Company Building and from the center axis of Iolani Palace to the Pacific Trade Center. The Hawaiian Telephone building and the

Pacific Trade Center were selected as the respective upper sight line reference points for the reason that as seen from the State Capitol and Iolani Palace, they had "the greatest visual impact in the CBD [Central Business District]." The projected update of the HCD Ordinance was, of course, not confined to building height limitations.

In April, 1976, GAC submitted a first draft of an updated HCD Ordinance to the City Council staff. With respect to the area upon which the CPB site happened to be located, it provided that the building height limit would be subject "to sightlines drawn from the ground elevation in front of Iolani Palace entrance to the top elevation of the Pacific Trade Center." By the use of this guideline, the projected CPB building would have been allowed to go up to 310 feet. As pointed out earlier, however, the structure now being built on the premises will extend upwards to approximately 264 feet.

On May 21, 1976, the Capital District Advisory Committee met to discuss the GAC's draft ordinance. Very little discussion was had with regard to the Ewa boundary height limitation question, but the minutes do contain the following comments from Mr. Ali Sheybani of the City Council staff:

> The Ewa boundary of the district. We have still conflicting opinions on the height. One saying that it should be 150 feet; the other one saying we should go to the CZC. [i.e., 350 feet.] So in that, we have to take both or all comments into consideration before the final ordinance, Mr. Chairman.

After further study and consideration, the GAC during the latter part of July, 1976, submitted a second draft of a proposed updated HCD Ordinance. This draft was passed on first and second readings by the City Council as Bill 111, Draft 1, and submitted to the Capital District Advisory Committee for its comments. The height limit for the precinct along Alakea Street where the CPB's present project site is located was reduced to 250 feet. No precise reason was given by the consultant for this reduction.

During the remainder of July and August, 1976, Bill 111, Draft 1, was subjected to additional scrutiny by the Advisory Committee of which Councilman Rudy Pacarro was the chairman. The City Planning Commission also held public hearings on the bill, on five separate occasions, during the months of September and October,

1976. At the conclusion of these hearings, the commission on October 20, 1976 recommended against its passage. Thereafter, Bill 111, Draft 1, was scheduled for public hearing before the City Council. This hearing was advertised in both major Honolulu newspapers as required by law. Although not legally required, additional notices were published prior to the date of the hearing. The hearing was held as scheduled on November 17, 1976.

At this hearing, Mr. Ali Sheybani of the Office of Council Services and Mr. Chin Pai on behalf of GAC, testified and presented written testimony in support of the measure. Six other individuals representing their respective organizations appeared and testified on the bill. All of them, with the exception of the Queen's Medical Center representative, also submitted written testimony. CCWC did not testify; neither did it offer written testimony at this hearing. These written submissions were mostly negative in their comments on the proposed height limitations along the Ewa boundary. The written statement presented by the Downtown Improvement Association was the sole exception.

The City Council's Planning and Zoning Committee thereafter appointed Councilman Pacarro as a subcommittee of one "to review all comments on this matter and to submit a report back to the Planning and Zoning Committee." To assist him, GAC was again retained to do some additional work on Bill 111, Draft 1, with instructions to take into account the comments received and the discussions held on the bill up to that time. On March 7, 1977, GAC submitted a revised draft to the City Council. This became Bill 111, Draft 2, which was ultimately enacted into law as Ordinance 77-60. A public hearing was not held on this latest revised draft, but Mr. Pacarro did request and obtain comments on it from a number of private organizations and governmental agencies. Most remained opposed to the raising of the height limits at the Ewa boundary. The Downtown Improvement Association, on the other hand, continued to express its preference for the application of CZC height standards to this area. The HCD Advisory Committee, at its meeting on April 5, 1977, took a position similar to that expressed by the Downtown Improvement Association. And in a letter written to Mr. Pacarro, appellee CPB requested that "the block bounded by King Street, Alakea Street, YWCA, and the Kamamalu Building which is subject to building height control under the proposed revised ordinance, be

allowed to go to the full 350 height limitation allowed by the CZC."

On June 1, 1977, the Council Committee on Planning and Zoning recommended that the revised draft of Bill 111 be reported out for consideration and passage on third reading. Bill 111, Draft 2, did pass third reading and it was then forwarded to then Mayor Frank F. Fasi for his signature. On June 9, 1977, Mayor Fasi returned the bill unsigned, but without written objections, to the City Council. However, notwithstanding the lack of the Mayor's signature, Bill 111, Draft 2, became law as Ordinance 77-60, pursuant to Section 3-203 of the Revised Charter of the City and County of Honolulu.[1]

The determinative issue in this appeal is: Whether the failure of the City Council to advertise and to hold a public hearing on the second draft of Bill 111 violated the provisions of Section 6-1006 of the Honolulu Charter, and if so, whether Ordinance 77-60 is therefore null and void?

Appellant CCWC contends that Ordinance 77-60 is invalid because the City Council failed to hold a public hearing on the second draft of Bill 111 before acting upon it and passing it on third reading. The basic thrust of its argument is that while Bill 111, Draft 1, was subjected to a public hearing, the change effected by Bill 111, Draft 2, raising the building height limit at the Ewa boundary of the so-called Alakea Commercial Precinct of the HCD from 250 feet (under Draft 1) to 310 feet, (under Draft 2) was so substantial as to require another notice and a public hearing prior to final action by the City Council. It urges that "[i]f the Council is empowered to enact an ordinance with such material amendments without a further notice and hearing, the language contained in Section 6-1006 of the Charter is made meaningless."

We agree with CCWC that as a general proposition, an amendment to a zoning ordinance will be held invalid where, as finally

---

[1] Section 3-203 of the Revised Charter provides in pertinent part:

[E]very bill which has passed the council and has been duly authenticated by the city clerk and the presiding officer of the council shall be presented to the mayor for his approval. If he approves it, he shall sign it, and it shall then become an ordinance. If he disapproves it, he shall specify his objections within ten days (excluding Saturdays, Sundays and holidays) after receiving it. If he does not return it with his disapproval within that time, it shall take effect as if he had signed it. . . .

adopted, it contains alterations so substantially different from the changes proposed in the notice as to amount to an entirely new proposal. For this court has recognized that "[t]o permit the original proposal to be completely ignored and adopt another proposal which was not advocated or discussed at the public hearing may destroy the statutory requirement for a public hearing." *Ala Moana Boat Owners v. State,* 50 Haw. 156, 160, 434 P.2d 516, 519 (1967). We also agree with CCWC that the change from a height limit of 250 feet to 310 feet was not insubstantial when considered in and of itself. But we disagree that the deviation from the noticed proposal had the effect of rendering meaningless the public hearing called to address it. Neither do we find that the changes embodied in Draft 2 were such as to transform it into a new legislative proposal.

CCWC points out that interested persons having notice of what the City Council purported to do might well have failed to attend the public hearing, being satisfied with that which was proposed. This is a valid observation. But in the context of the situation then prevailing, neither CCWC nor other members of the public had the right to expect that the final legislative product, particularly with respect to building heights along the Ewa boundary, would be limited to that embodied in the noticed proposal.

Section 6-1006 of the Honolulu Charter, which requires public hearings before zoning ordinances may legally be adopted, provides as follows:

Zoning Ordinances. The council shall, *after public hearings,* enact zoning ordinances which shall contain the necessary provisions to carry out the purpose of the general plan and development plans. In enacting the ordinances, the council shall take into consideration the character of the several parts of the city and their peculiar suitability for particular uses and types of development with a view to encouraging the most appropriate use of land throughout the city. The ordinances shall contain reasonable standards with respect to the location, height, bulk, size of buildings and other structures, the area of yards, courts, off-street parking spaces and facilities and other open spaces, the density of population, and the use of buildings, structures and land for trade, industry, business, residence or other purposes. [Emphasis added]

The hearings provision of Section 6-1006 is designed to provide

public participation in the enactment of zoning ordinances, for whether they are affected owners or not, members of the public do have a definite interest in the manner in which their city is to be developed. The object of these hearings is to afford such interested persons an opportunity to make known their views and to apprise the City Council of their opposition to, or approval of, the proposed ordinance. Among those obviously interested in building regulations are owners of property that may be affected by the proposal. Where pertinent and relevant to the zoning issue under consideration, they may advocate or suggest variances to the advertised proposal. Implicit in this Charter-mandated procedure, therefore, is the possibility that changes in the original proposal might ensue as a result of the views expressed at the hearings. Accordingly, such notice may not always be taken by those to whom it is addressed to be an accurate forecast of the ultimate action to be taken by the City Council.

In the present case, an entire zoning district was involved. The CPB project site comprised only a very small portion of an entire historical, scenic, cultural district that would be affected by the subject ordinance. The bill was addressed to the uses and the manner in which all of the property within the district could be utilized. And the zoning question with which we are here concerned was related to the whole of the Ewa boundary and was not addressed solely and specifically to the CPB site. It was not confined to a consideration of how high a building on the CPB property, as a specified project, should be allowed to rise. At issue before the council, among other considerations, was the general subject of height limitations. Competing pressures for the utilization of the land areas along this boundary was evident, and the City Council was made aware that height limits ranging from the then existing limit of 150 feet under the HCD Ordinance to the CZC standard of 350 feet were being advocated. For that matter, the Council's own consultant, GAC, had initially recommended a height limit of 310 feet. Up to the time of the final passage of Ordinance 77-60 (Bill 111, Draft 2), therefore, the crucial issue before the City Council, where height limitations were concerned, was how high buildings along the boundary should be allowed to project. In these circumstances, Bill 111, Draft 1, could not have been anything more than a legislative

vehicle by which the zoning issues involved could be fully aired and discussed before the City Council acted upon its final form.

Members of the public had the right to speak on these issues and their views on these matters were entitled to consideration by the council. And given the existence of conflicting forces regarding the use of land along the boundary, which is located directly across the street from a business district containing commercial high rise buildings, it could reasonably be expected that there would be divergent testimony touching upon the sensitive issue of height limitations — some for height limits lower than those proposed in the noticed proposal and others for higher limits. Such testimony would have been relevant to the basic zoning issue under consideration. And as it turned out, there was such testimony. On a question of such public import, the council could no more ignore views advocating limits higher than those proposed than it could disregard expressions of support for lower height limits. Even the appellant seams to recognize this, for in oral argument it conceded that had there been an express request at the public hearing for the height limit eventually adopted, its arguments asserting the invalidity of the ordinance would not be as persuasive.

No express or specific request for the adopted change in the original proposal was necessary. That such an alternative was called to the attention of the council, which had the power and responsibility to enact an ordinance designed to accommodate its and the public's concerns, was sufficient. Cf. *Ala Moana Boat Owners v. State, supra.*

At the public hearing on Bill 111, Draft 1, the Downtown Improvement Association (DIA), whose voluntary membership included 95 per cent of the land and building ownership in the downtown area, told the council that the bill would be acceptable.[2] Nonetheless, it intimated that the CZC limitation of 350 feet would have been much more preferable. In its written testimony presented at

---

[2] CCWC makes much of the fact that the DIA in its written testimony expressly approved Bill 111, Draft 1, at the public hearing. The DIA, obviously, was not going to oppose the bill, inasmuch as it did furnish some "measured relief for two of the major buildable lots abutting on Alakea Street on its Ewa side in downtown." The proposal had, after all, raised the building height limits from 150 feet to 250 feet.

the public hearing, it advised the council:

The existing Ewa boundary is an area of concern in DIA. In the years that have transpired since the current law was adopted in April 1972, both the Citizens Advisory Committee to the Civic Center, appointed by the Mayor, and a similar committee appointed by the Council were in substantial agreement that the boundary for height and open space control between downtown and the Civic Center would best run generally along the rough center line of the blocks between Alakea and Richards Streets. DIA believes this should extend from Beretania Street to at least King Street. We interpreted this to mean that all building lots abutting Richards Street on its Ewa side would come under tight height and open space control within the Civic Center boundary and that all properties abutting on Alakea Street on its Diamond Head side would be subjected to architectural review of proposed developments, *but that height and open space would be that permitted by the current Comprehensive Zoning Code.*

The underlying phylosophy of a center block boundary was based upon the fact that the building frontage along Alakea Street on both its Ewa and Diamond Head sides should generally be compatible. Also the same philosophy would apply along Richards Street; and that any abrupt height change should occur generally in the center line of the block for good urban design. This basic purpose was included in the recommendations to the City Council and the updated Warnecke recommendations. [Emphasis added]

The DIA reiterated these views when it was asked by Councilman Pacarro to comment on Bill 111, Draft 2, which now provided for a height limit of 310 feet. The DIA would still have preferred the application of the CZC to the Ewa boundary, at least between Beretania Street and King Street. It wrote the councilman:

We are not completely in accord with the principle of using lines of site [sic] on the Ewa flank to adjacent high buildings as the controlling criteria for height limits; however, we do note that this technique does permit some relief from the more restricted height and open-space requirements of the existing ordinance. *We would have preferred Comprehensive Zoning Code Control for the three precincts involved, for both height and open space.* However, the

controls which are imposed permit meaningful development to take place in the above sites for the first time since the Hawaii District Ordinance became law. Consequently we find the latest recommendations acceptable. [Emphasis added]

There was, therefore, expression of support at the public hearing for limits higher than those proposed. Also worthy of note is the fact that the height limits adopted were not incompatible with those governing immediately adjacent property, such as the Pacific Trade Center. This was consistent with the requirement that in the enactment of zoning ordinances, the City Council must take into consideration "the character of the several parts of the city and their peculiar uses and types of development with a view to encouraging the most appropriate use of land throughout the city." Section 6-1006 of the Honolulu Charter.

All interested parties were afforded the opportunity to be heard at the public hearing, and both oral and written testimony were received on the subject. Such testimony reasonably could have been anticipated and were properly within the scope of the basic zoning issue under consideration. And it must also be remembered that the amended HCD ordinance was adopted by the council only after intensive study and extensive discussions with interested individuals and organizations — both public and private. In the circumstances of this case, therefore, we think that the spirit and intent of Section 6-1006 have been complied with. "To require another hearing whenever there is any revision of the text of an original proposal after full hearing would be too formidable a burden on the rulemaking process." *Ala Moana Boat Owners v. State, supra.*

The foregoing discussion, however, is not intended to suggest, as perhaps *Ala Moana Boat Owners v. State, supra,* might be construed to suggest, that the City Council may adopt a proposal different from the noticed proposal, so long as the changes adopted have been advocated or discussed at the public hearing. For as we have already pointed out, an amendment will be declared invalid where, as finally adopted, it is so fundamentally different from that originally proposed as to amount to a new proposal. That was the situation, for example, in *DeLucia v. Town of Jamestown,* 107 R.I. 179, 265 A.2d 636 (1970); *Summit Properties, Inc. v. Wilson,* 26 Ariz. App. 550, 550 P.2d 104 (1976); *Nesbit v. City of Albuquerque,* 91 N.M. 455, 575 P.2d 1340 (1977); *Shefler v. City of Geneva,* 1 Misc.2d 807, 147 N.Y.S.2d 400

(1956) — cases from other jurisdictions upon which CCWC relies.

In *DeLucia, supra*, the establishment of land use districts was involved. The plaintiffs in that case were the owners of 150,000 square feet of property. The noticed proposal would have established a district providing for minimum lot sizes of 40,000 square feet for building purposes; the final legislative product provided instead for lot sizes of 80,000 square feet. Other very significant alterations were made to the original proposal following the public hearing. In holding the ordinance invalid, the Rhode Island supreme court pointed out:

> The record establishes that not only was the proposed map amended so as to substantially affect the plaintiffs' property as to area limitations, but substantial alterations were also made to the proposed amendment to the ordinance. In this regard it is of controlling significance to note that whereas in the proposed amendment on which the public hearing of December 5, 1966 was held, churches were prohibited in three districts, permitted as a matter of right in two and only by way of a special exception in three, the amendment purportedly adopted prohibited churches in but one district and made them permitted uses in all others. [265 A.2d at 640.]

In *Summit Properties, supra*, the appellants had petitioned the zoning commission for a rezoning of the real property it owned from the existing "A" General Zone to R-1-6,000; C-1-6,000; and R-SD. Its petition to this effect was advertised for public hearing. The appellees, adjoining landowners, did not appear at the public hearing which was duly held. Subsequent to the hearing, the commission submitted to the board a proposed amendment classifying the appellant's property R-1-6000; R-M-6000 and C-2. In comparing the requested changes as advertised and the changes actually recommended by the commission, the Arizona court pointed out:

> Two of the three recommended classifications differed substantially from those in the published notice relating to the Commission hearing, as is evident from the following explanation of the zoning categories involved. The "R-SD" zoning (the type of zoning advertised), . . . allows the property to be used for single family dwellings, duplexes and multiple dwellings. Uses not

shown on the original or approved modified design are prohibited uses.

In comparison, "R-M" zoning (approved by the Commission instead of "R-SD") permits use for single family dwellings, duplexes, multiple dwellings *and office buildings.* Furthermore, through a use permit, motels and hotels, automobile service stations, parking lots and retail commercial activities and other similar uses may be permitted.

The published notice of the Commission hearing designated "C-1-6000" as the commercial designation. Section 11 permits motels and hotels, hospitals, retail stores, offices and personal service establishments and churches in C-1-6000. In addition, other uses may be permitted through the utilization of a use permit, such as automobile service stations, dance halls, taverns, and other establishments selling alcoholic beverages, launderettes and self-service dry cleaners, and off-premises billboards or out-door advertising displays.

The Commission adopted a "C-2" zone for this area, which permits warehouses, petroleum bulk plants, automobile repair shops, laundries, outdoor sales establishments, public garages, used car sales lots, small manufacturing or fabrication plants, mortuaries and other uses. [550 P.2d at 105-106.]

The court then affirmed the trial court's finding that the change in the property's classification "was too substantial and too fundamental to be within reach of the notice."

In *Nesbit, supra,* the New Mexico Supreme Court held that the change in development plans allowing for the construction of 287 residential units instead of the 83 units initially allowed was so substantial as to require notice and a new hearing. The court said:

The subsequent amendment to the plans from 83 to 287 units constitutes a fundamental change in the restrictions which were placed on the property in 1966 and requires that notice be given and a public hearing be held. [575 P.2d at 1343.]

And in *Shefler, supra,* the proposed ordinance which was noticed for public hearing had provided for the classification of the district in which the plaintiffs' property was located as "residential." Because the plaintiffs' property was listed as "multiple residence" under that classification, they apparently had no objection to the ordinance as proposed. As finally adopted, however, the new zoning ordinance

had converted the area into a "highway users' use" district. The New York court pointed out:

> Without any further formal notice or public hearing on the matter, at a special meeting of the Common Council on December 17, 1953, the zoning ordinance proposed at the public hearing on December 8th was further considered and drastically and extensively amended in that the section of the city in which the plaintiffs own property and where they reside was changed from a residential classification to a "highway users' use" district. The uses permitted in this district included gasoline service stations and a number of other trades and industries which plaintiffs find objectionable and concerning which objection they claim they had no opportunity to be heard. Where such a substantial change is made subsequent to the public hearing and without any further notice or hearing the resulting enactment is invalid. [147 N.Y.S.2d at 403.]

In all of the foregoing cases, the changes adopted were so fundamental as to, in effect, transform the original proposals into new proposals. Such, however, was not the case here. We do not find the final action taken by the City Council, with respect to height limitations along the Ewa boundary of the HCD, to have been so drastic a departure from the noticed proposal as to warrant the invalidation of the challenged ordinance.

Affirmed.[3]

*Jerry Michael Hiatt, Joseph Kiefer* and *Stacy J. Henderickson (Carlsmith, Carlsmith, Wichman & Case,* of counsel) for plaintiff-appellant.

*Paul Devens* and *Francis Yamashita, (Ikazaki, Devens, Lo, Youth & Nakano,* of counsel) for defendants-appellees.

---

[3] We further find the appellant's other specifications of error to be without merit.